(77 Misc. Rep. 427.)

## In re WELCH.

(Surrogate's Court, Kings County. July, 1912.)

1. GOOD WILL (§ 2*)—NATURE OF BUSINESS.

Whether the customers of a business dealt for cash or not, and whether they were constant or not, furnishes no criterion for a finding as to whether the business has a good will.

[Ed. Note.—For other cases, see Good Will, Cent. Dig. § 1; Dec. Dig. § 2.*]

2. GOOD WILL (§ 7*)—DETERMINATION OF VALUE—ANNUAL INCOME.

The rule that the average annual profits for the last three years before his death are to be taken as the value of the good will of a decedent's business is not applicable in case of abnormal profits in one of the years, produced by exceptional conditions, and such profits in excess of the highest profits in either of the other years should be disregarded.

[Ed. Note.—For other cases, see Good Will, Cent. Dig. §§ 6–9; Dec. Dig. § 7.*]

3. PARTNERSHIP (§ 257*)—DEATH OF PARTNER—ACCOUNTING—GOOD WILL OF BUSINESS.

An executor, who was his testator's partner, is chargeable on judicial settlement of his accounts with one-half of the appraised value of the good will of the partnership.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. § 563; Dec. Dig. § 257.*]

4. PARTNERSHIP (§ 67*)—PROPERTY OF FIRM.

Where a partnership, composed of an executor and his testator, had for many years paid the rent of piers in the city of New York as the expense of the business, but the leases stood in the name of the executor personally prior to the formation of the firm, and so continued until testator's death, the executor could only be charged with half the value of the plant upon the piers at the time of his partner's death; the leases not being partnership property, in the absence of an assignment thereof.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. §§ 95–100; Dec. Dig. § 67.*]

5. PARTNERSHIP (§ 255*)—DEATH OF PARTNER—CHARGES—PROFITS FROM BUSINESS.

Where a contract, if regarded as preserved as a firm asset of a partnership between an executor and his testator, was carried out by the executor after he took over the business, without contribution from the estate of the deceased partner, the estate can be credited with only the naked profit under the contract, with proper offsets to the executor's capital, services, and general plant.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. §§ 552–561; Dec. Dig. § 255.*]

Judicial settlement of the account of Augustus W. Welch, as executor of the last will of Edwin M. Welch. Decree entered.

Coombs & Wilson, of Brooklyn (C. W. Wilson, Jr., of Brooklyn, of counsel), for executor.

Rose & Putzel, of New York City (Benjamin G. Paskus and Louis S. Ehrich, Jr., both of New York City, of counsel), for objectant.

Henry A. Jordan, special guardian, for Loren E. Harter.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

KETCHAM, S. The question is presented as to the existence of good will in the business in which the decedent and the accountant were partners. The business was long continued in the same depots—was conducted by signs and trade-names intended for no other purpose than to create and continue the prestige of an established enterprise and to maintain the approval of the trade upon which it depended. The business was not based upon peculiar personal talents, but rather upon honest and efficient methods of marketing a commodity which had no eccentric quality to distinguish it from the product of others. It depended merely upon a deserved repute for clean ice and clean dealing.

[1] Whether its customers dealt for cash or not, whether they were constant or not, furnishes no criterion for a finding as to whether the business had a good will. An established and respected trade, which appeals to casual purchasers, is at least as much the subject of good will as one which caters to a fixed and faithful number of patrons. The qualities which successfully serve a fluctuating class of customers coincide peculiarly with the elements upon which, according to the authorities, good will grows into an asset of calculable value. It cannot be said that there was not a good will inherent in this business.

[2] The cases teach that three times the average annual profits will fairly represent the value of good will in a case where good will is found. For convenience, and, indeed, for accuracy, the last three years of the course of an enterprise are generally taken for the calculation. In the case at bar the profits for the last three years before the decedent's death were as follows: 1906, $95,302.-80; 1907, $7,675.49; 1908, $23,023.32.

It appears that in 1906, upon the employment of a cash capital of $45,000 in addition to the capital sunk in the business, the partners secured a profit obviously abnormal. Not only was this gain produced by exceptional conditions, but the same conditions in turn produced a decline in the business of harvesting and selling natural ice, since the great profits of that year stimulated the erection of plants for the making of artificial ice and the extension of ice factories already in existence.

Hence it would be irrational and unjust to embody the entire profit of the year 1906 as an element in the present problem. The sole reason for the process by which a number of years is taken into consideration is that a fair mean average of the capacity of the business should be the only standard. The very thought of average excludes a year which might properly be called phenomenal.

The calculation in this case will be based upon the last three years completed before the decedent's death; but it seems necessarily fair that the profits of 1906 should be disregarded, so far as they exceed the highest profit realized in any other year. This is done, not only because the exceptional profit has no place in the computation of averages, but also because its tendency was to de-

stroy, rather than to enhance, good will. The figures of profit for the present purpose should therefore be: 1906, $23,023.32; 1907, $7,675.49; 1908, $32,023.32—making in all $62,722.13. From this should be deducted interest on capital annually advanced and withdrawn. This should be reckoned for the entire year. The cash capital was employed only during the months between January and November, and was not all at the disposition of the firm for that whole period. But there was scant opportunity for its employment outside the business of the firm. The aggregate of the capital invested in these three years was $134,388.92, on which interest for one year is $8,063.32.

There is no basis in the evidence for a finding that the value of the partners' personal services was more than the sums drawn by them and charged against the profits.

[3] The good will of the partnership is appraised at $45,658.84, with one-half of which the executor is charged. Upon clerical errors, the accountant is charged with $469.26. If this sum should be reduced by $146.19, as argued by the accountant, the correction, for which no evidence at present appears, may be made upon the presentation of findings.

The executor is disallowed all items of rent of the Coxsackie ice house which accrued after November 1, 1909, when the business as a partnership was closed and taken over by the accountant as his own. These amount to $2,552.06.

There is no basis for a finding that the amounts credited to the estate upon the purchase by the surviving partner of the equipment of the Wallabout depot and the Newtown Creek depot were not a just and fair one-half of the value thereof. His earlier offer to pay more for the articles was made in the course of an endeavor to adjust differences between him and the present objectant, and it was specifically qualified by the statement that the price offered was "considerably more than the executor considered to be the fair value of that property and considerably more than the appraisement which he had obtained."

[4] The executor held certain leases of piers in the city of New York, which were used for years by the partnership, and the rental of which was annually paid as an expense of the business. These leases stood in the name of the executor personally prior to the formation of the firm, and they so continued until the decedent's death. In contrast with the tenure of these city leases, the Coxsackie ice house was leased to the two partners by name. As to one of these leases, covering the Stanton Street depot, the objectant claims that its value should be ascertained, and credit for one-half thereof should be given to the estate. Without an assignment of this lease by the legal owner, it is not possible to find that it was partnership property. The owner could at any time fairly convenient to the firm have withheld the leased premises from the firm use at the end of the year for which the firm had paid the rent, and the only interest which the partnership could assert was

the right to continue in the enjoyment of the leased premises for an entire year after any part of the rental for that year was paid by the firm. Moreover, there is no convincing evidence that the value of the occupation and use of the Stanton Street pier for the term of the lease thereof was more than the sum reserved by the landlord, and the actual rental presumptively represents the actual value of the use of the premises.

The fixtures at the Stanton Street and Eighteenth Street depots were owned by the firm. The firm maintained them in repair, and the executor speaks of "the buildings, tools, etc., to carry on the business," as constituting part of the firm capital, and it is obvious that in this statement he referred to all the buildings and tools employed in the business. The executor sold his brother an interest in two other depots early in their partnership, and testifies that he never sold to him any interest in the Stanton Street and Eighteenth Street depots. But when an arrangement for a one-half interest in the profits of the entire business went into effect, the only conclusion to be taken from the general arrangement, and from the other conduct of the parties, is that the equipment at Stanton street and Eighteenth street became partnership assets. The finding will be that at the death of the decedent the plant at Stanton street was worth $500, and the plant at Eighteenth street was worth $152.21. With one-half of each of these sums the executor is charged.

[5] If it be conceded that the relation of the estate to the Seaman contract was such that the executor should be charged with any profit made in the exercise of that contract after the executor took the business to himself on November 1, 1909, it is still impossible to make a finding as to any sum properly chargeable in this account. The contract, if it be regarded as preserved as a firm asset, was carried out by the executor after November 1, 1909, by the employment of his own capital, his own services, and his own equipment, without contribution from the estate. The business done thereunder was commingled with the executor's general enterprises. The estate cannot in any event be credited with anything except the profit nakedly made under the Seaman contract, with proper offsets for the executor's capital, services, and general plant. There is no ground for anything beyond a nominal charge, and the objection in this regard is overruled.

Decreed accordingly.